James A. BURGESS, Plaintiff,

v.

Robert E. HAMPTON, Chairman, U. S. Civil Service Commission et al., Defendants.

Civ. A. No. 76–0863.

United States District Court, District of Columbia.

Sept. 29, 1976.

Memorandum and Order on Motion for Attorneys Fees Jan. 12, 1977.

Lawrence S. Lapidus, Washington, D. C., for plaintiff.

Derek I. Meier, Dennis Dutterer, Jordan A. Luke, Asst. U. S. Attys., Washington, D. C., for defendants.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

GESELL, District Judge.

This trial *de novo* presented plaintiff's claim that he was denied promotion due to his race. He came before this Court having fully pursued his administrative remedies. He first complained to an EEO counsellor. The counsellor was unable to resolve the matter and plaintiff filed a formal complaint on September 24, 1974, and when his complaint was rejected on January 22, 1975, he sought a hearing before a Complaint Examiner who reported negatively on June 6, 1975. The Internal Revenue Service ("IRS") accepted the Examiner's finding of no discrimination on June 13 and an appeal was then taken to the United States Civil Service Commission which, on April 7, 1976, upheld the finding of no discrimination.[1]

Plaintiff, an offset press operator, sought promotion to Assistant Foreman for the printing plant of the IRS Publishing Services Branch. Plaintiff is the senior employee of that plant with 34 years of service. He is black.

The prior Assistant Foreman, Johnson, was black but the position had been open for some time after Johnson voluntarily took a cut in pay to become a supervisor in

1. The administrative record, together with underlying testimony and exhibits, was received in evidence solely to indicate the nature and regularity of the administrative proceedings.

the camera shop of the Publishing Services Branch where he felt he could make use of his hands and be more comfortable. In 1974, plaintiff and three other senior blacks working in the printing plant applied for the Assistant Foreman job previously held by Johnson. They were all turned down. Eventually a white from "outside" was selected and this led to plaintiff's complaint.

At the trial the Court heard testimony from 12 witnesses, including some of plaintiff's co-workers and various persons having supervisory responsibility for the printing plant.

The Assistant Foreman job involves more than simply seeing to it that the machines operate smoothly and are well maintained. It includes a degree of responsibility for production planning and scheduling and the incumbent has contact with customer clientele. Mere ability to operate the various machines and presses is not enough.

When the vacancy first developed the management experimented with a plan to use the job on a temporary rotating assignment basis for management trainees. This plan did not achieve the necessary continuity of supervision. The position was then posted and four in-house blacks with long service in the printing plant applied. The managers felt that each applicant lacked technical strength in printing production and the qualities necessary successfully to supervise others. Once this decision was made and the applicants rejected, the position was tentatively offered to three blacks employed respectively by the Office of Transportation, Agriculture and Treasury, but in each instance the job offer was declined. Finally, a white from Pennsylvania was chosen who had extensive knowledge of machines and production scheduling and supervisory experience. He was better qualified than plaintiff for the Assistant Foreman job.

Testimony focusing on plaintiff's qualifications was necessarily pointed. After hearing all the witnesses and appraising their credibility the Court finds that the determination that plaintiff was not qualified for the Assistant Foreman position was in no way affected by his race, but was based on a sincere belief that he lacked the personality and capacity to supervise and deal with others, and upon his lack of experience in production management.

Three co-workers of plaintiff stated that they were willing to work under him. Two expressed the view that he had no skill in dealing with people, was moody, and did not get along well with some co-workers. Management witnesses, particularly Murray, Kent and Parise, testified in one way or another that plaintiff had been a continuing personnel problem for 23 years, that his production was average or minimum, that he required repeated counselling. It was particularly emphasized that his relations with co-workers were poor, that from time to time he would refuse to speak to a particular worker for substantial periods of time and that he even refused to communicate with the back-up worker on his own press for a period. Management had difficulty communicating with him, including his immediate boss. He was screened out for lack of leadership capacity and ability to supervise.

█ Plaintiff contends that discrimination nonetheless existed because of the stratified job environment. The printing plant employs about 17, presently only blacks, and it has had four white employees since 1960. The whites in the past have either quit or moved up. All of the supervisors above plaintiff are white. While there are blacks in supervisory positions in the plant in charge of the smaller bindery and camera sections, the only Assistant Foreman in charge of the printing plant who was black in the period since 1963 was Johnson. Plaintiff emphasizes the absence of training and preparation for advancement to the higher levels.

While superficially this position raises matters for serious consideration, on analy-

sis it does not hold up. Plaintiff himself was given an opportunity to enter and did enter a management course at Agriculture, but this did not change his general relations with co-workers. The fact that the Assistant Foreman job had been held by a black immediately before the vacancy, that efforts were made to persuade him to continue and that the vacancy was then first offered to three other blacks, all carry great weight in this context. The ultimate suggestion that management was unwilling to appoint a black to fill the position with a black which plaintiff suggests is wholly without merit. In all the documentation and testimony there is not a single indication of racial prejudice and indeed the agency was not only conscious of its obligations towards minorities but acted accordingly. Plaintiff is paid something between $16,000 and $17,000 per annum and is at the breaking point for progress into management responsibilities. Since the determination was made that he lacks qualifications for this advancement and this decision was in no way influenced by plaintiff's race nor by racially discriminatory practices in the plant where plaintiff worked, the complaint must be dismissed.

## MEMORANDUM AND ORDER

## ON MOTION FOR ATTORNEY'S FEES

Plaintiff, James Burgess, brought this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, alleging that he had been a victim of race discrimination by the Publishing Services Branch of the Internal Revenue Service. All named defendants, except William Simon, as Secretary of the Treasury, were dismissed before trial.[1] On September 29, 1976, after a trial *de novo,* this Court entered a judgment in favor of the Secretary and dismissed the complaint. This matter is now before the Court on

defendant's motion for attorney's fees as the prevailing party.

Attorney's fees are not ordinarily recoverable by prevailing parties in American litigation. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). Only in certain limited situations may a court use its discretion to award fees. For example, if there has been willful disobedience of a court order, or if the losing party has proceeded in "bad faith, vexatiously, wantonly, or for oppressive reasons," the opposing party may be granted reasonable attorney's fees. *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *F. D. Rich Co. v. United States,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974). Congress, of course, by explicit legislation may set different conditions for awarding fees, or it may remove entirely the courts' power to grant them. *Alyeska, supra.*

Title VII explicitly allows courts in their discretion to grant attorney's fees to "the prevailing party, other than the Commission [Equal Employment Opportunity Commission] or the United States." 42 U.S.C. § 2000e–5(k). This section was part of the 1964 Civil Rights Act which outlawed private employment discrimination. It was then incorporated by reference in the 1972 amendments to the Act which extended Title VII protection to federal employment. 42 U.S.C. § 2000e–16(d). Since under the 1964 Act the United States only could be a plaintiff, section 5(k) could not originally have been intended to bar an award of attorney's fees to a prevailing Government defendant. *See Grubbs v. Butz,* 548 F.2d 973 n. 15 (D.C.Cir. 1976). It is impossible to determine from the legislative history, however, whether by incorporating section 5(k) in the 1972 amendments Congress intended

---

1. By agreement of counsel at a status conference in chambers on July 20, 1976, defendants Hampton, Alexander and Murray were dropped from the case.

to ban awards of fees to prevailing Government defendants, or whether it intended to allow them as it had for prevailing private defendants. Thus, where a Government defendant prevails in a Title VII action there certainly has been no explicit congressional determination to alter the traditional judicial power to award attorney's fees. Without explicit congressional action to the contrary, the customary fee rules outlined in *Alyeska* apply, and the Secretary of the Treasury is entitled to attorney's fees only under an exception to the general rule against granting them.

The only exception even arguably present here is that for bad faith in the prosecution of an action. The Court after a hearing found plaintiff's claim of discrimination "wholly without merit." However, this alone does not indicate that plaintiff acted in bad faith, vexatiously, wantonly or for oppressive reasons. Plaintiff was the senior employee at the printing plant of IRS Publishing Services, having thirty-four years' experience. He was repeatedly denied promotion based primarily upon his inability to deal with co-workers. Although this inability is certainly a valid reason to deny promotion to a management position, it is a rather subjective consideration. Thus, plaintiff's suspicion of discrimination was not unreasonable, particularly since most supervisory personnel were white while most production personnel were black. Indeed, the Court found that superficially there were facts that raised "matters for serious consideration." While the evidence did not bear out plaintiff's allegations, he had some reason to suspect discrimination. Certainly he did not act in bad faith by trying to substantiate these beliefs. In addition, plaintiff's counsel conducted this action in a competent professional manner. No attempt was made in discovery to go beyond the confines of the complaint, or to use litigation tactics to harass the defendant. Plaintiff helped bring the action to a prompt and timely resolution. The Secretary's motion for an award of attorney's fees is denied.

SO ORDERED.